## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

| | | |
|---|---|---|
| HALEY MACKRELL, *as parent of* | ) | |
| M.T.M., *surviving child of* | ) | |
| HAKEEM WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 7:24-CV-00007-LAG |
| ANGELA BUTLER, individually, | ) | |
| | ) | |
| Defendant. | ) | |

### BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Angela Butler, through counsel, submits this brief in support of her motion for summary judgment. Discovery having concluded, Defendant submits that the death of inmate Hakeem Williams, while tragic, was not the result of a constitutional violation by her and certainly not the result of a clearly established constitutional violation. Accordingly, Defendant Butler is entitled to summary judgment.

### I.    INTRODUCTION

Plaintiff brought this action under 42 U.S.C. § 1983, claiming that Defendant Butler was deliberately indifferent to the safety of former inmate Hakeem Williams ("Inmate Williams"). (Doc. 1). Inmate Williams was assaulted, resulting in his death, on February 28, 2022, in J-1 dormitory at Valdosta State Prison ("VSP"), a segregation unit where he had been assigned to the same cell as his assailant, inmate Jonathan Bivens ("Inmate Bivens"). On the day of the assault Defendant Butler was the one Correctional Officer assigned to J-1 dormitory.

Plaintiff claims that Defendant Butler placed Inmate Williams at a substantial risk of injury or death when she placed a handcuffed Inmate Williams into his cell with his uncuffed cellmate,

- 1 -

Inmate Bivens.  (Doc. 1, p. 7, ¶ 39).  Plaintiff claims that Defendant Butler then did not appropriately call for help and did not try to stop the assault.  (Doc. 1, p. 8, ¶ 43-44).

As shown herein, Plaintiff has no evidence that Defendant Butler was subjectively aware that Inmate Williams was at risk of serious harm when she returned him to the cell that he occupied with Inmate Bivens, and no evidence that she knew that the manner of returning him to the cell – placing him in the cell with the handcuffs on and then closing the cell door so that she could remove the handcuffs through the tray flap – would result in Inmate Bivens assaulting him.  Moreover, the undisputed evidence is that Defendant Butler responded reasonably by calling a code for additional officer support as soon as the assault began.  On these facts Plaintiff cannot establish that Defendant Butler was deliberately indifferent to Inmate Williams' safety as required for her claim.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Inmate Williams and Inmate Bivens were state prisoners confined in the same cell at VSP in February 2022.  (Exhibit B Emmons Decl. ¶¶ 10-12 and Attachments 3, 4).  Inmate Bivens was placed in cell J-1-37, on February 1, 2022.  (*See id.*).  Inmate Williams was placed in cell J-1-37, on February 8, 2022.  (*See id*.).

J-1 is an Administrative Segregation-Tier II lockdown dorm.  (Exhibit A Butler Decl. ¶ 3; Exhibit B Emmons Decl. ¶ 8).  Inmates in Tier II must be handcuffed behind their backs whenever being brought out of their cells.  (Exhibit B Emmons Decl. ¶ 5).  When returning the inmate to the cell, handcuffs are to only be removed once the inmate is inside the cell and the door is closed and locked.  This process is used for every movement including shower escorts.  (*See id.*).

Defendant Butler was a Correctional Officer II at VSP who was assigned to work J building on a number of shifts in February 2022.  (Exhibit A Butler Decl. ¶ 3; Exhibit B Emmons Decl. ¶¶ 7-8 and Attachment 2).  Specifically, she worked as the one officer assigned in J building – including

over J-1 and J-2 which are the two inmate living units in the building and also over J-control which is the security area where access (both entry and exit) to the building is controlled, on the following dates in February 2022: February 4, 5, 6, 9, 10, 18, and 28.  (*See id*.).  As the VSP Post Rosters show, on those dates Defendant Butler worked Shift 1A Key, which was a 6:00 a.m. to 6:00 p.m. shift. (*See id*.).

Inmates in J-1 received showers three times per week, on Monday, Wednesdays, and Fridays, so in February 2022 Defendant Butler would have taken the J-1 inmates from their cells to the showers and back from the showers to their cells on the following dates: February 4, 9, 18, and 28. (Exhibit A Butler Decl. ¶ 4).  Given her J-1 shift assignments and the dates when Inmates Bivens and Williams were celled together in J-1, Defendant Butler would have taken Inmates Bivens and Williams from their shared cell to the showers and back from the showers to their shared cell on the following dates: February 9, 18, and 28.  (Exhibit A Butler Decl. ¶¶ 3-5; Exhibit B Emmons Decl. ¶¶ 8-12 and Attachment 2).

Defendant Butler was familiar with Inmates Bivens and Williams from having worked J-1 building but did not know much information about them.  She did not know any aliases they might have had or used, and she did not know the nature of their convictions.  (Exhibit A Butler Decl. ¶ 6).  Defendant Butler did not know of any issues or problems between Inmates Bivens and Williams. Neither of them ever complained to her about the other, and neither of them ever expressed to her a fear or concern for his safety in being placed in a cell with the other.  (*See id.* ¶ 7).  Prior to February 28, 2022, she had conducted shower escorts of Inmates Bivens and Williams on two occasions – February 9 and 18 – without any problems or issues.  (*See id*. ¶ 8; Exhibit C Butler Dep. at 136 (stating she did not know of any issues between the two inmates).

On February 28, 2022, Defendant Butler started her shift at 6:30 a.m. and when she started her shift she had two sets of handcuffs.  (Exhibit A Butler Decl. ¶ 9 and Attachment 1).  February

28, 2022 was a Monday and so it was a shower day in J-1.  Defendant Butler started running showers at 6:40 a.m. that morning.  (Exhibit A Butler Decl. ¶ 10 and Attachment 1).  When Defendant Butler started running showers in J-1 on February 28 she had two sets of handcuffs.  She escorted Inmate Williams and Inmate Bivens to the shower separately.  She had no problems when removing either of them from their cell.  (Exhibit A Butler Decl. ¶¶ 11-12).  Inmate Bivens finished his shower first and so Defendant Butler escorted him back to their cell first.  She placed Inmate Bivens into the cell, closed and locked the cell door, and then uncuffed him through the tray flap in the door.  (Exhibit A Butler Decl. ¶¶ 14-15).  Defendant Butler was called by her supervisor Unit Manager Lt. Morrison to take an inmate from J-1 to K building for medical.  She had to handcuff the inmate while escorting him to the medical callout and she had to leave the inmate in K building with the handcuffs on him, and so after that she had only one set of handcuffs when she returned to J-1 and continued running the shower escorts.  (Exhibit A Butler Decl. ¶ 15).

Defendant Butler continued to run shower escorts in J-1 that morning after she returned from taking the inmate to the medical callout.  (Exhibit A Butler Decl. ¶ 16).  When Inmate Williams finished his shower, Defendant Butler handcuffed him and escorted him back to the cell that he occupied with Inmate Bivens.  (Exhibit A Butler Decl. ¶ 17).  Inmate Williams did not indicate to Defendant Butler that he did not want to return to their cell or that he feared Inmate Bivens.  Inmate Williams did not inform Defendant Butler of any threats, danger, or risk of harm from Inmate Bivens.  Defendant Butler was not aware of any threats against Inmate Williams or any risk to his safety in J-1 or in the cell he shared with Inmate Bivens.  On the escort back to his cell, Inmate Williams was pulling away from Defendant Butler and talking to other inmates about meal trays.  (Exhibit A Butler Decl. ¶ 18; Exhibit C Butler Dep. at 137).

Defendant Butler placed Inmate Williams in the cell, and as the cell door was slamming, Inmate Bivens jumped off his bottom bunkbed and began striking Inmate Williams.  (Exhibit A

- 4 -

Butler Decl. ¶ 19).  Defendant Butler secured the door and immediately began to call a code on the radio for assistance.  She first called the code for medical assistance but immediately realized that was error and called the code for inmates fighting.  (Exhibit A Butler Decl. ¶ 20; Exhibit C Butler Dep. at 135, 138).  To make the radio call she had to step away from the cell and go up the steps in the dormitory because the area right at the cell door often did not have a good radio signal.  (*See id.*).

At the time that Defendant Butler placed Inmate Williams back into the cell with Inmate Bivens, she had no reason to believe or suspect that there was a risk of danger to Inmate Williams from not handcuffing Inmate Bivens inside the cell first.  (Exhibit A Butler Decl. ¶ 22).  She had not had any issues with other shower escorts that day.  (Exhibit A Butler Decl. ¶ 23).

Inmates who occupy the same cell are not handcuffed inside their cells.  Inmates Bivens and Williams had occupied the same cell for twenty days before February 28, 2022, and in that time Defendant Butler was not made aware of any issues between them.  (Exhibit A Butler Decl. ¶ 24).

Handcuffs are applied by having the inmate place his hands through a tray flap in the cell door before the door is unlocked and opened, and they are removed after placing the inmate in the cell, closing and locking the cell door, and having him place his hands through the tray flap.  (Exhibit A Butler Decl. ¶ 25; Exhibit B Emmons Decl. ¶ 4).  Even when utilizing a two-handcuff process, meaning both inmates are handcuffed before an inmate is moved out of or placed into the cell, there is always a moment when one inmate in the cell is handcuffed, and the other inmate is not.  This is because only one inmate can place his hands in the tray flap at a time—they must take turns to come to the flap for cuffing and uncuffing.  (Exhibit A Butler Decl. ¶ 25).

Defendant Butler did not know that Inmate Bivens had a contraband knife or any other weapon.  She did not know that Inmate Bivens intended to harm his cellmate.  (Exhibit A Butler Decl. ¶¶ 26-27).  And she did not think something like that would happen while she was running showers on February 28, 2022.  (Exhibit A Butler Decl. ¶ 28).

When working her shifts Defendant Butler did not carry a weapon of any sort. Handcuffs and the radio were the only security devices she had. (Exhibit A Butler Decl. ¶ 29; Exhibit B Emmons Decl. ¶ 16). When Inmate Bivens attacked Inmate Williams, Defendant Butler did not open the cell door or enter the cell and instead she made the call on the radio for assistance, and she did this because correctional officers are trained to secure the inmates, if possible, and call for assistance when one inmate violently assaults or attacks another inmate, not to physically intervene in a violent inmate altercation without other officers to assist. (Exhibit A Butler Decl. ¶ 30).

Correctional officers such as Defendant Butler are not in charge of and do not have responsibility or authority over staffing, and do not have the ability to alter or change staffing levels or decisions. (Exhibit B Emmons Decl. ¶ 17).

If Inmate Williams had indicated any fear or concern about being placed in a cell with Inmate Bivens, Defendant Butler would have notified her supervisor. (Exhibit A Butler Decl. ¶ 31). The J-1 logbook shows that she did exactly that earlier on the February 28, 2022 shift when another inmate (Albert) said he was scared to go back into a cell with his cellmate. (*See id.* and Attachment 1). Defendant Butler notified her supervisor Unit Manager Lt. Morrison and during the shift the inmate was moved into another cell. (*See id*.).

Defendant Butler gave a recorded interview to a GDC investigator and wrote two witness statements after the February 28, 2022 assault by Inmate Bivens on Inmate Williams. (Exhibit A Butler Decl. ¶¶ 32-34 and Attachments 2-4). The statements contained the exact same information related above about how Defendant Butler escorted inmates in J-1, including Inmate Bivens and Inmate Williams, to and from the shower on February 28, 2022. (*See id.*).

After the opportunity for full discovery, as shown by Plaintiff's written discovery responses which have not been supplemented, Plaintiff has no evidence of a specific threat of harm to Inmate Williams prior to the February 28, 2022 attack that was known to Defendant Butler. (SMF ¶33 and

- 6 -

Exhibit D).  Moreover, even though Inmate Bivens and Inmate Williams had shared a cell for twenty

days prior to Inmate Bivens' attack, after full discovery, as shown by Plaintiff's written discovery

responses which have not been supplemented, Plaintiff has no evidence of a prior assaultive or

violent interaction or history of animosity between the two inmates that would have placed

Defendant Butler on notice that one would assault the other.  (*See id.*).

## III.    ARGUMENT AND CITATION OF AUTHORITY

Summary judgment is appropriate "when the evidence before the court demonstrates that

there is no genuine issue of material fact and that the moving party is entitled to judgment as a

matter of law."  *Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002) (quoting Fed. R. Civ.

P. 56(c)).  The court construes the evidence "in the light most favorable to the non-moving party."

*See id*.  However,

> A party opposing summary judgment may not rest upon the mere
> allegations or denials in its pleadings. Rather, its responses, either
> by affidavits or otherwise . . . must set forth specific facts showing
> that there is a genuine issue for trial. A mere "scintilla" of evidence
> supporting the opposing party's position will not suffice; there must
> be enough of a showing that the jury could reasonably find for that
> party.

*Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990).  "Where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for

trial."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### A.    Defendant Butler Is Entitled to Summary Judgment on Plaintiff's Eighth Amendment Failure to Protect Claim

Section 1983 provides a cause of action for damages against every person who, acting

under color of state law, deprives another of "rights, privileges, or immunities, secured by the

constitution and laws" of the United States.  42 U.S.C. § 1983.  In the context of a prisoner claim

that prison officials failed to protect one inmate from another inmate, the Supreme Court has said

that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  Prison officials, thus, have a duty to protect prisoners from violence committed by other prisoners.  *Id.*, at 833.  But "not … every injury suffered by one inmate at the hands of another … translates into a constitutional liability for prison officials responsible for the victim's safety."  *Id.* at 834.

That is because "a prison custodian is not the guarantor of a prisoner's safety."  *Purcell ex. rel. Estate of Morgan v. Toombs County, Ga.*, 400 F.3d 1313, 1321 (11th Cir. 2005).  Rather, the Eighth Amendment's "prohibition on cruel and unusual punishments requires prison officials to 'take reasonable measures to guarantee the safety of the inmates.'"  *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021) (quoting *Farmer*, 511 U.S. at 832).  This standard requires "due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'"  *Farmer*, 511 U.S. at 845.

To violate the Eighth Amendment, a prison official must have a "sufficiently culpable state of mind."  *Farmer*, 511 U.S. at 823.  In *Farmer*, the Supreme Court held that the required culpability – deliberate indifference – occurs only when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  In addition, because the prison official's responsibility is to take "reasonable measures" to protect an inmate, *Farmer*, 511 U.S. at 832 (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)), the Eighth Amendment is not violated so long as he responds reasonably to the known risk "even if the harm ultimately was not averted."  *Id*. at 844; accord *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) ("An Eighth Amendment violation will occur when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[] reasonably to the risk.'" (quoting

*Farmer*).  Finally, causation is an essential element of the claim. *See Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).

Thus, to make out an Eighth Amendment claim based on deliberate indifference to inmate safety, the plaintiff must allege and ultimately prove: (1) that there was a substantial risk of serious harm; (2) that the prison official was subjectively aware of that risk; (3) that the prison official disregarded the known risk by not responding reasonably to it; and (4) causation.  *See Farmer*, 511 U.S. at 832, 837; *Marsh*, 268 F.3d 1014 at 1028; *Carter*, 352 F.3d at 1349.  Recently the Eleventh Circuit has confirmed that a plaintiff claiming deliberate indifference "must prove that the defendant acted with 'subjective recklessness as used in the criminal law.'" *Wade v. McDade*, 106 F.4th 1251, 1255, 1262 (11th Cir. 2024) (*en banc*) (quoting *Farmer*, 511 U.S. at 839).

### 1. The Evidence Does Not Show a Substantial Risk of Serious Harm of Which Defendant Butler was Subjectively Aware.

When examining the first element—a substantial risk of serious harm—the court uses an objective standard.  *Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1099 (11th Cir. 2014).  To prevail, inmates must show, *inter alia*, that the prison officials were subjectively aware of a "strong likelihood" of harm rather than a "mere possibility" of harm.  *Marbury v. Warden*, 936 F.3d 1227, 1233, 1236 (11th Cir. 2019).  The fact that Inmate Williams was assaulted cannot establish that a substantial risk of harm existed.  *Smith v. Reg'l Dir. of Fla. Dep't of Corr.*, 368 Fed. Appx. 9, 14 (11th Cir. 2010) (refusing to allow "advantage of hindsight" to determine whether an inmate faces a substantial risk of harm) (quoting *Purcell*, 400 F.3d at 1320).  An objectively substantial risk of serious harm may be shown in one of two ways: a "general threat" to inmates based on dangerous conditions in the prison or a particular area of the prison, or by an individualized risk based on a "specific threat" to the plaintiff.  *Marbury*, 936 F.3d at 1233, 1235; *see also Purcell,* at 1320.

Plaintiff alleges a sort of combined theory of individualized risk to Inmate Williams based on dangerous conditions of the prison. However, this is not one of the ways to show an objectively substantial risk of serious harm. Moreover, Plaintiff can make neither the required showing of a "general threat" to inmates nor a "specific threat" to Inmate Williams.

*General threat based on conditions of dangerousness*

When assessing the objective component in the general, environmental context, courts have recognized that "a risk of harm to some degree always exists by the nature of its being a [prison]," and that not every condition rises to the level of an Eighth Amendment violation. *Purcell*, 400 F.3d at 1323. "[O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 8-9, 112 S. Ct. 995 (1992). However, confinement in "a prison where violence and terror reign is actionable."[1] *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014) (quoting *Purcell*, 400 F.3d at 1320). This threshold is a very high one, with courts requiring that a plaintiff demonstrate conditions that "shock the conscience" to survive summary judgment. *Purcell*, 400 F.3d at 1323; *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1048 (11th Cir. 2014) (plaintiff must show a "constant and unreasonable exposure to violence" that are "obvious flagrant, rampant, and of continued duration."). Additionally, when this Court has "held that a generalized risk of violence from a prison population could support a claim of deliberate indifference … the plaintiff has pointed to specific features of a facility or its population rendering it particularly violent." *Marbury*, 936 F.3d at 1234.

_____

[1] Of course, such a dangerous conditions claim is actionable only against an official who has both the responsibility and the authority to address, and correct, the condition. *See LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993).

Plaintiff alleged in her complaint that there were "conditions at VSP [that] posed a substantial risk of harm to all incarcerated there."  (Doc. 1, p. 5, ¶ 29).  Fights on a regular basis; inmates in possession of unconfiscated weapons, such as shanks and knives; unmanned security posts; lack of monitoring and supervision of known violent prisoners; contraband and illegal drugs; issues with internal security cameras; and routine inadequate staffing.  (Doc. 1, p. 6, ¶ 29 (a) – (h)).  Plaintiff also asserted that Defendant Butler was deliberately indifferent to a "generalized risk" of violence in the prison.  (Doc. 1, p. 5, ¶ 31).

But in this case this theory fails as a matter of law.  Aside from Inmate Williams' death, Plaintiff's claim as pleaded is premised on an alleged average of approximately two homicides per year in the 6-year period preceding the instant homicide and specifically three homicides by stabbing with contraband knives two years before the instant homicide, in 2020.  (Doc. 1, ¶ 29 (i)).  VSP housed more than one thousand inmates in 2022.  (Exhibit B Emmons Decl. ¶ 2).  While even one homicide is an unacceptable prison security outcome, the law is settled that a less than two-homicide per year average in a prison that houses over one thousand inmates does not rise to the level of constant, flagrant, and rampant violence required by the case law to make out a claim on the theory of general dangerousness.  *See Keith*, 740 F.3d at 1048; *cf. Marbury*, 936 F.3d at 1231 (fifteen inmate-on-inmate stabbings was insufficient to create a generalized substantial risk of harm); *Purcell*, 400 F.3d at 1320 (holding that three violent incidents in the months before the attack on the plaintiff did not establish that prison conditions were so generally dangerous as to create a substantial risk if serious harm); *see also Harrison*, 746 F.3d at 1299.  Nor do these incidents establish a prison environment that "shocks the conscience" or in which "violence and terror reign."  *See Purcell*, 400 F.3d at 1323.  And Plaintiff has no evidence to show any "specific features" of VSP that rendered it "particularly violent."  Nothing about the general conditions of VSP show a "strong likelihood" of harm rather than a "mere possibility" of harm.

Further, a general conditions of dangerousness claim against Defendant Butler rests on matters beyond her control. As a non-supervisory officer, Defendant Butler was not in charge of and did not have responsibility or authority over staffing, and did not have the ability to alter or change staffing levels or decisions. (Exhibit B Emmons Decl. ¶ 17). And there is no evidence that will show that she had the authority to take action to address or correct any perceived security deficiencies. *See LaMarca*, 995 F.2d at 1536 ("[T]o demonstrate an official's deliberate indifference, a plaintiff must prove that the official possessed … the means to cure [the unconstitutional] condition.").[2]

*Individual risk based on specific threat*

Plaintiff also cannot show an individualized risk personal to Inmate Williams based on specific threats to his safety from Inmate Bivens. Plaintiff pleaded in her complaint circumstances that simply do not equate to a specific threat of harm or individualized risk to Inmate Williams. For example, Plaintiff alleged that Inmate Bivens has an alias of "Mad Max," and that he is serving a lengthy sentence for violent offenses (Doc. 1, p. 3, ¶ 8); that there was an "increased risk to Mr. Williams due to his being handcuffed and locked in a cell with an uncuffed cellmate" (Doc. 1, p. 4, ¶ 18); that Defendant Butler "did not search Bivens to ensure that he was not in possession of a

---

[2] Moreover, even if Defendant Butler had a supervisory role (and she did not), this theory would fail because Plaintiff has no evidence showing a "deliberate intent" to understaff, *see Ireland v. Prummell*, 53 F.4th 1274, 1292 (11th Cir. 2022) (quotation and citations omitted), or that "a more complete staffing were possible financially or otherwise," s*ee Anderson v. Atlanta*, 778 F.2d 678, 687 (11th Cir. 1985), or that it was a deliberate choice to not have more staff at VSP, or that VSP failed to take steps to combat weapons contraband and violence within the prison.

weapon" (Doc. 1, p. 4, ¶ 10); and that Defendant Butler "cuffed Mr. Williams and then sent Bivens into his cell uncuffed and with a 9-inch knife." (Doc. 1, p. 6, ¶ 32).

But the evidence does not support a claim under these allegations. Defendant Butler did not know Inmate Bivens' aliases and was not aware of the nature of his conviction,[3] she did not know that he possessed a contraband weapon or that he intended to harm Inmate Bivens, and she did not perceive that there was a risk to Inmate Williams arising from the way she was running the J-1 inmates to the showers with one set of handcuffs on February 28, 2022. Moreover, as detailed above, the assault here occurred after the two inmates had been celled together in J-1-37 for a period of nearly three weeks, and also after Butler herself had escorted the two to the showers and back twice, without any known incidents. There is no evidence of a prior altercation involving Inmate Williams and Inmate Bivens; no evidence that Inmate Williams felt threatened by Inmate Bivens or otherwise feared for his safety in cell J-1-37; and no evidence that Inmate Williams informed Defendant Butler of any fear for his safety or need for protection from Inmate Bivens in their cell or otherwise.[4]

Plaintiff also premises her claim on the allegation that Defendant Butler had "actual subjective knowledge of the risk of violence that would result from *leaving one incarcerated man in a cell cuffed and the other uncuffed*." (Doc. 1, p. 3, para 14) (emphasis added). But that is totally non-sensical in this case because the two inmates were cellmates; and so, by definition they

---

[3] Although there is no evidence that Defendant Butler knew of Inmate Bivens' alias or conviction history, even the fact that Inmate Bivens may have been convicted of "violent offenses" is insufficient to show a known substantial risk of harm because "much more than mere awareness of [an inmate's] generally problematic nature" is required to show subjective knowledge. *Carter*, 352 F.3d at 1350; *accord Johnson v. Boyd*, 701 Fed. Appx. 841, 845 (11th Cir. 2017).

[4] The Warden of VSP immediately prior to the day of assault, Shawn Emmons, has stated that there is no record of any request for protection or movement from Inmate Williams during the time he was assigned to J-1-37 with Inmate Bivens. (Exhibit B Emmons Decl. ¶ 13).

lived in and occupied a cell together – uncuffed – every day.  This case does not involve "leaving" one inmate in a cell cuffed while another is "left" in the same cell uncuffed.  Instead, it involves the removal and placement of the inmates in the cell, a task that necessarily involves a moment or period of time when one is cuffed and another is not.  Defendant Butler did not know of or perceive a risk in handling shower escorts as she did on February 28, 2022 and there is no evidence that she had seen or experienced a similar assault occur when running showers in that way.

Defendant Butler was asked in deposition whether GDC policy requires cuffing both inmates in a cell when returning one of the inmates to the cell, and she responded that it did and that was the usual practice.  (Exhibit C Butler Dep. at 49-52).  But the VSP Warden, Shawn Emmons, has explained that GDC policy did not require that an officer handcuff both inmates when a cell door is opened and both inmates are present.  (Exhibit B Emmons Decl. ¶ 15).  Defendant Butler also was asked in deposition if it would be against GDC policy and reckless to lock one cuffed man in a cell with an uncuffed man, and she responded yes.  (Exhibit C Butler Dep. at 50-51).  But again that is not what happened in this case – she did not leave or lock two inmates in a cell, one cuffed and one not cuffed.  Instead, she placed the handcuffed Inmate Williams into his shared cell with Inmate Bivens, and that placement was for the short duration and purpose of getting him in the cell so that she could uncuff him after securing the cell door.  While there is conflicting evidence as to whether that was a policy violation, there is no evidence that Defendant Butler *knew* that by handling the shower escort in that way that Inmate Bivens would attack Inmate Williams.  And she has said that she did not know.  (Exhibit A Butler Decl. ¶ 40).  The law requires that Plaintiff show that Defendant Butler *knew* that *her conduct* in returning Inmate Williams into his shared cell with Inmate Bivens, without first handcuffing Inmate Bivens, put Inmate Williams at substantial risk of serious harm.  *See Wade*, 106 F.4th at 1255.  There is no

- 14 -

such evidence in this case.  And a policy violation, even if one occurred, does not establish deliberate indifference.  *See Goodman v. Kimbrough*, 718 F.3d 1325, 1329-1334 (11th Cir. 2013).

**2.  The Evidence Does Not Show That Defendant Butler Failed to Respond Reasonably to the Assault by Inmate Bivens.**

Plaintiff's claim also fails because she cannot show that Defendant Butler failed to respond reasonably to the assault.  The fact that Defendant Butler did not stop the assault is not proof of deliberate indifference.  *See Farmer*, 511 U.S. at 844 (stating the Eighth Amendment is not violated so long as the officer responds reasonably to the known risk "even if the harm ultimately was not averted"); *accord Marsh*, 268 F.3d at 1028.  While there does not appear to be an Eleventh Circuit decision directly on point, the law as developed in other circuits under *Farmer* is that correctional officers who are present during a violent inmate altercation are not required to intervene immediately when they are unarmed, unaware of a prior risk of harm before the altercation, and take reasonable steps to intervene safely.  *See, e.g., Seals v. Marcus*, 2013 U.S. Dist. LEXIS 25299, *19, 20 (M.D. Ga. Jan. 25, 2013) (*quoting Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006) ("[N]o rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence.")); *Odom v. South Carolina Dep't. of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003).

*Longoria* is instructive.  In that case a state prisoner was stabbed in his dormitory twenty-eight times by two fellow inmates.  473 F.3d at 589.  The plaintiff claimed deliberate indifference when three prison guards who were present, but unarmed, during the altercation failed to stop the assault.  Initially, the Fifth Circuit rejected as conclusory a claim by the plaintiff that the guards participated in or aided the assailing inmates in their attack.  473 F.3d at 593.  Then the Court rejected the deliberate indifference claim, explaining its reasoning as follows:

> . . . Longoria argues that because Farr, Staggs and Rogers were
> present in the pod at the inception of the attack, their failure to

intervene abdicated their duty to protect him and amounted to deliberate indifference. . . . .

Longoria in effect asks this court to fashion a new Eighth Amendment rule that would require unarmed prison guards to physically intervene in altercations between armed inmates or risk being found deliberately indifferent. Although we have previously held that an officer's failure to take reasonable measures to protect a suspect from excessive force can give rise to § 1983 liability, [ ], no rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence. The officers violated no "clearly established" law by failing to intervene while unarmed.

*Id.* at 593-594 (internal citations and quotations omitted). Other courts, including the Fourth, Seventh and Tenth Circuits, follow this same reasoning. *See Odom*, 349 F.3d at 773; *Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997) ("heroic measures are not constitutionally required"); *Carrothers v. Kelly*, 2009 U.S. App. LEXIS 4613, **3 (5th Cir. Feb. 23, 2009) (finding no deliberate indifference when floor officer fled tier when inmate was being stabbed by another inmate, where the officer was unarmed, gave a verbal command for the assault to stop and radioed for help); *Guzman v. Sheahan*, 495 F.3d 852, 858 (7th Cir. 2007) (finding no deliberate indifference where control booth guard did not physically intervene or even give a verbal command to stop an inmate altercation and instead made a 10-10 call for back and left her post for three minutes looking for backup); *Mackay v. Farnsworth*, 48 F.3d 491, 492-493 (10th Cir. 1995) (finding no deliberate indifference by two prison guards who observed but did not intervene in an inmate fight and instead called for additional staff and medical personnel); *see also Black v. Colunga*, 656 F. Supp.2d 625, 638 (E.D. Tex. 2009) ("The Plaintiff also complained that Morrison and Colunga did not intervene during the assault; instead, they just watched. In *Longoria*, the Fifth Circuit held that unarmed officers are not required to endanger their own safety in order to protect a prison inmate threatened with physical violence."). Thus, an officer may be held liable for a failure to intervene in a fight between two inmates only "if [s]he was physically able and had a

realistic chance to intervene and act in time to protect the inmate ….” *Glispy v. Raymond*, 2009 U.S. Dist. LEXIS 77100, 2009 WL 2762636 (S.D.Fla, Aug. 28, 2009) (citing *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998*); Byrd v. Clark*, 783 F.2d 1002 (11th Cir. 1986)).

This case is controlled by the statement from *Farmer* that “prison officials . . . may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.” 511 U.S. at 844; *compare Odom*, 349 F.3d at 773 (stating that “a correctional officer who stands by as a passive observer and *takes no action whatsoever* to intervene during an assault violates the rights of the victim inmate”) (emphasis in original). And based on the foregoing precedents, Plaintiff cannot show deliberate indifference by Defendant Butler in connection with the assault by Inmate Bivens.

It bears great emphasis that in this case Defendant Butler did not fail to act in response to the assault by Inmate Bivens. Plaintiff contrarily alleged that Defendant did not intervene by calling for help (Doc. 1, p. 7, ¶ 36) and then that she “did not appropriately call for help in time.” (Doc. 1, p. 8l ¶ 43). But it is simply not true that she did not call for help. As soon as the assault began, Defendant Butler called a code for help. She has admitted that in the chaos of a frantic situation she initially called the wrong code (for medical assistance), but then immediately called the correct code (inmates fighting). But this simply is not a case where prison officials “[g]ratuitously allow[ed] the beating . . . of one prisoner by another.” *Farmer*, 511 U.S. at 832. Nor is it a case where a correctional officer “stands by as a passive observer and *takes no action whatsoever* to intervene” during an inmate altercation, as in *Odom*, 349 F.3d at 773 (emphasis in original). Rather, it is a case like those cited above where the officers took reasonable steps to stop the assault, though the assault continued for a short period of time before the first officer responded to the code. Defendant Butler acted in accordance with her training, which called for her not to enter into the altercation between the two inmates, but instead to secure both inmates, call for help,

- 17 -

and wait for additional officers to enter the cell where the inmates were in the altercation.  And the Constitution does not require her to do otherwise, in the circumstances of this case.

### B. Qualified Immunity Bars Plaintiff's Claim

Defendants are entitled to qualified immunity, as "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) (quotation marks omitted).  The test for qualified immunity is two pronged: (1) was the government official acting within the scope of his discretionary authority; and (2) did the official's conduct violate "clearly established law." *Maggio v. Sipple*, 211 F. 3d 1346, 1350 (11th Cir. 2000).  "Once the defendant establishes that []he was acting within h[is] discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F. 3d 1188, 1194 (11th Cir. 2002).  To carry that burden, the plaintiff must show that the constitutional right asserted was clearly established at the time the alleged violation occurred.  *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  In the Eleventh Circuit, only United States Supreme Court, Eleventh Circuit, and Georgia Supreme Court cases may clearly establish rights under federal law.  *See Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 827 (11th Cir. 1997) (en banc).

Defendant Butler was acting within her discretionary authority when she performed her duties as a correctional officer.  Plaintiff cannot show that Defendant Butler violated Inmate Williams' Constitutional rights.  Defendant Butler was not aware of a risk of assault occurring between two inmates who had occupied a cell together for 20 days without incident.  And Defendant Butler responded reasonably by calling for officer assistance when the assault occurred.  No case law suggests otherwise.  An officer cannot act on a threat that she did not subjectively perceive, and no binding precedent requires an officer to put herself at risk to rescue an inmate

from violence.  In fact, several of the cases that are cited in the foregoing section were decided on qualified immunity grounds and recognize that there is no "clearly established" law requiring unarmed officers to intervene in a violent inmate confrontation, rather than summoning help from additional officers.  *See Longoria*, 473 F.3d at 594 ("The officers violated no 'clearly established' law by failing to intervene while unarmed."); *Odom*, 349 F.3d at 773 ("In June 2000, it was clearly established in this circuit that correctional officers who are present when a violent altercation involving an armed inmate erupts and fail to intervene immediately do not violate the Eighth Amendment if the officers are unarmed, unaware of a risk of harm prior to the altercation, and take reasonable steps to intervene safely."); *Black*, 656 F. Supp.2d at 638 ("The officers violated no clearly established law by failing to intervene while unarmed. [ ].  They are entitled to summary judgment based on qualified immunity.") (citing *Longoria*) (internal citation and quotations omitted).

Further, the Eleventh Circuit has acknowledged that, at the time the events of this case occurred, the law governing Eighth Amendment deliberate-indifference claims was "hopelessly confused, resulting in what we'll charitably call a mess."  *Wade*, 106 F.4th at 1254 *quoting Wade v. McDade*, 67 F.4th 1363, 1371 (11th Cir. 2023), *vacated and reh'g en banc granted*, *Wade v. Ga. Corr. Health*, 83 F.4th 1332 (11th Cir. 2023).  Here, "existing precedent [had not] placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations and citation omitted).  The standard for deliberate indifference was not clearly established in 2022 when Plaintiff's matter arose.  It is now, though, after *Wade*.  *See Stalley v. Cumbie*, 124 F.4th 1273 (11th Cir. 2024) (citing *Wade*, 106 F.4th at 1255 (explicitly "repudiat[ing] our dueling 'more than' [negligence or gross negligence] formulations").

Finally, Section 1983 provides a remedy for a violation of a federally protected right, not a department policy.  *See Baker v. McCollan*, 443 U.S. 137 (1979).  A failure to follow department

policy does not amount to a constitutional violation. *See Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002); *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000). In other words, the policies of the GDC do not establish constitutional rights. Plaintiff's contention, and the conflicting information in this case as to whether Defendant Butler violated GDC policy, do not give rise to a triable issue of fact because this case concerns only whether the Constitution was violated. "Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984); *see also Toenniges v. Morales*, 2012 U.S. Dist. LEXIS 56175, 17, 2012 WL 1390184 (S.D. Ga. Feb. 28, 2012); *Green v. Fye* , 2011 U.S. Dist. LEXIS 121899, 6-7, 2011 WL 5025158 (M.D. Ga. Oct. 21, 2011).

## IV.    CONCLUSION

For the foregoing reasons, Defendant Butler respectfully asks that the Court grant her motion and enter judgment in her favor on Plaintiff's claim in this case.

Respectfully submitted, this 10th day of February, 2025.

|  |  |
|---|---|
| CHRISTOPHER M. CARR<br>Attorney General | 112505 |
| LORETTA L. PINKSTON-POPE<br>Deputy Attorney General | 580385 |
| Roger A. Chalmers<br>Senior Assistant Attorney General | 118720 |
| */s/ Shelley T. Milton*<br>SHELLEY T. MILTON<br>Assistant Attorney General | 769415 |

PLEASE ADDRESS ALL
COMMUNICATIONS TO:

SHELLEY T. MILTON
Georgia Department of Law
40 Capitol Square, SW
Atlanta, Georgia 30334
T: (404) 458-3620
F: (943) 200-4291
Email: smilton@law.ga.gov

<u>**CERTIFICATE OF SERVICE**</u>

I do hereby certify that I have, this day, filed the foregoing **DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record who are registered to use the CM/ECF system.

I further certify that I have mailed by United States Postal Service, postage paid, the foregoing document to the following non-CM/ECF participant:  NONE.

This 10th day of February, 2025.

/s/ *Shelley T. Milton*
SHELLEY T. MILTON        769415
Assistant Attorney General