**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

HALEY MACKRELL, *as parent of*
M.T.M., *surviving child of* HAKEEM
WILLIAMS,

     Plaintiff,

v.

ANGELA BUTLER,

     Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO.: 7:24-CV-7 (LAG)

## <u>ORDER</u>

Before the Court is Plaintiff Haley Mackrell's Motion for Sanctions (Doc. 18). Therein, Mackrell asks the Court to sanction Defendant Angela Butler for providing false statements in her interrogatory response. (*Id.* at 1). Mackrell also asks the Court to sanction non-party Georgia Department of Corrections (GDC) for spoliation based on destruction of video evidence that could have captured the underlying incident. (*Id.* at 1, 19–20). For the reasons set forth below, Plaintiff's Motion is **GRANTED**.

## BACKGROUND

This case arises from the stabbing death of Hakeem Williams by his cellmate, Johnathan Bivens, while both Williams and Bivens were incarcerated at Valdosta State Prison (VSP). (Doc. 1 ¶¶ 6–7). Plaintiff Haley Mackrell brought this 42 U.S.C. § 1983 action on behalf of her and Williams' daughter, M.T.M., against Defendant Angela Butler—the correctional officer who failed to adhere to safety protocols when she placed a handcuffed Williams into a cell with an uncuffed Bivens. (*See id. generally*). Plaintiff alleges that Defendant's actions constitute deliberate indifference to Williams' Eighth Amendment right to be free from cruel and unusual punishment; thus, Defendant's statements and admissions about her actions are of critical importance in this litigation. (*See id.* ¶¶ 38–48).

Defendant gave four statements following the stabbing. Defendant's first statement came on the day of the incident, February 28, 2022. (Doc. 52-4). Therein, she, under oath and via signed affidavit, stated that she "observed inmate Biven assaulting inmate Williams with an unknown object" and that after the incident "[t]he video tape was reviewed" (*Id.* at 1–2). She also detailed the medical actions taken in response to the stabbing. (*Id.*). In her second statement given on March 23, 2022, Defendant stated that while transporting inmates to and from the showers she "[r]eturn[ed] . . . with one pair of handcuffs[,]" "[r]eturned [i]nmate Williams to [the] cell and didn't cuff [inmate] Bivens" who then "jumped up off [the] [b]ed and attacked Williams[.]" (Doc. 52-2). Defendant initialed the statement (*Id.*).

In the course of discovery, Plaintiff propounded interrogatories to which Defendant responded on April 29, 2024. (Doc. 23-7). In response to Interrogatory Number Five which asked Defendant to state the factual basis for every defense stated in her Answer, Defendant under penalty of perjury stated, in pertinent part,

> [W]ith inmate Williams standing cuffed outside of the cell, I instructed inmate Bivens to come to the cell door to be cuffed. At that time, inmate Bivens placed his hands through the door flap, and I placed cuffs on inmate Bivens' hands. I then unlocked and opened the cell door and placed inmate Williams in the cell. At that time both inmates were inside the locked cell with their hands cuffed behind their backs. . . . I instructed inmate Williams to come to the door to be uncuffed first. Once inmate Williams was at the door to be uncuffed, inmate Bivens began attacking inmate Williams. I did not know this at the time, but I believe that inmate Bivens somehow slipped out of his handcuffs.

(Doc. 18-1 at 4).

Lastly, Defendant gave her fourth statement in a deposition on November 12, 2024. (Doc. 18-2). Therein, she was questioned about the truthfulness and accuracy of her response to Interrogatory Number Five. Defendant testified that, contrary to her attestation, her response to Interrogatory Number Five was not true and accurate. (*Id.* at 54:5–55:15). Specifically, Defendant admitted that she did not, in fact, cuff both men; rather, she only

2

had one set of handcuffs at the time. (*Id.* at 56:4–15). Defendant also admitted that she put a cuffed Williams into the cell with an uncuffed Bivens and that, contrary to her prior sworn statement, Bivens did not slip out of his handcuffs. (*Id.* at 56:4–15, 21–23). Defendant was also presented with her March 23, 2022, witness statement and testified that the statement was the truth about what happened. (*Id.* at 59:17–65:4).

It must be noted, that on March 30, 2022, Defendant was reprimanded for placing the cuffed Williams in the cell with an uncuffed Bivens. (*See* Doc. 23-14). The reprimand concluded that, "[a]s a result of not being cuffed, [Bivens] was able to strike the cuffed [Williams] resulting in his death. You created a dangerous situation for yourself and for [Williams]." (*Id.* at 2). Defendant was admonished that, "[i]n the future[, she was] not to deviate from the Standard Operating Procedures [(SOP)] on properly securing an inmate."[1] (*Id.*). On June 10, 2022, Defendant received a five percent salary reduction for three months as punishment for her conduct relating to Williams' death. (Doc. 23-15 at 2–3).

With regard to the video, Defendant stated during the initial post-incident interview that "video tape was reviewed[.]" (Doc. 23-5 at 3). GDC failed to preserve and produce the video footage related to Williams' death. In anticipation of litigation, Plaintiff's Counsel served a preservation letter by fax and email on Warden Shawn Emmons and Timothy C. Ward, Commissioner of GDC. (Doc. 18-8). The preservation letter was dated March 9, 2022, nine days after the killing of Williams. (*Id.*). Therein, Plaintiff demanded that all "documents, tangible things, and electronically stored information potentially relevant to the issues and defenses in this cause" to include "video and animation" be immediately preserved "even if [GDC did] not anticipate producing such [information] or intend[ed] to claim it [was] confidential or privileged from disclosure." (*Id.* at 2–3). Although video evidence was available to be reviewed by Defendant, Warden Shropshire, and Investigator Travis Sparks, GDC did not abide by this preservation letter. (*See* Doc. 23-5; Investigative Case Summary (on file with the Court)). In an email dated November 21, 2024, from GDC counsel Susan Rutherford, GDC admitted that they do "not have any video footage of the

---

[1]     According to a handwritten note along the top of the document, the reprimand was rescinded at some point. (Doc. 23-14 at 2).

3

incident in this case" although it "was viewed by the investigator and the deputy warden," "the footage was not downloaded or preserved and as a result, rolled over in the system as most video does." (Doc. 18-9). According to the Investigative Case Summary completed by Investigator Sparks, the video showed Defendant walking a handcuffed Williams back to the cell from showers, placing him into the cell, and witnessing the assault take place and calling for assistance. (Investigative Case Summary).

Plaintiff filed the present motion on December 20, 2024, seeking sanctions against Defendant Butler and nonparty GDC. (Doc. 18). Defendant responded on February 10, 2025. (Doc. 22). Plaintiff replied on February 24, 2025. (Doc. 26). The Court held an evidentiary hearing on November 13, 2025. (*See* Docket). At the hearing, Defendant Butler, Travis Sparks, and Ralph Shropshire testified before the Court. (*See* Doc. 51). Defendant testified that she was on duty on February 28, 2022, the date that Williams was stabbed by his cellmate Bivens. (Doc. 56 at 3:16–21). She declared that her interrogatory responses were given under penalty of perjury and were true and correct to the best of her knowledge. (*Id.* at 4:9–5:3). In explaining her fallacious response to Interrogatory Number Five, Defendant said that her response "what [she] remembered at the time. What [she] was thinking [she] was remembering when [she] wrote the statements." (*Id.* at 5:15–6:2). She also agreed that those words in response to Interrogatory Number Five were false and not actually the truth about what happened. (*Id.* at 6:7–15). Defendant testified that the truth of what happened is that she placed Williams into his cell handcuffed and Bivens was waiting inside the cell uncuffed, she locked the door and the attack didn't start until after she locked the door. (*Id.* at 7:16–11:5). She testified further that Bivens did not slip out of his handcuffs as she had indicated in her response as he was never wearing any handcuffs. (*Id.* at 11:8–14). Defendant was asked if she could offer "any other reason . . . [she] submitted a false statement under penalty of perjury[.]" (*Id.* at 12:2–4). Defendant responded that, her interrogatory "wasn't a false statement[;]" rather, "[i]t was what [she] was remembering in [her] head." (*Id.* at 5–10). Defendant never indicated in her interrogatory response that she didn't remember, that her memory was fuzzy, or that she was suffering from trauma and threw the incident out of her mind. (*Id.* at 15:15–16:4).

Defendant noted that she was truthful in her interview with Investigator Sparks and her written statement both given immediately after the stabbing. (*Id.* at 19:16–21:18).

Ralph Shropshire testified that he was Deputy Warden at the time of the stabbing of Williams and he watched the video of the stabbing. (*Id.* at 47:14–48:4). As a practice, Shropshire did not prepare incident reports; rather, once the reports were prepared by the shift supervisor, Shropshire reviewed the reports and forwarded them to the Warden. (*Id.* at 50:18–23). Shropshire acknowledged that the prison had staffing issues and that, on the date of the incident, Defendant was the only guard in a building that housed 90 people. (*Id.* at 54:9–55:15). He also testified that the proper procedure for taking an individual out of a cell and returning him to a cell required both that the person outside the cell and the person inside the cell to be cuffed before opening the door. (*Id.* at 57:15–58:13). Shropshire also agreed that placing a cuffed Williams in the cell with an uncuffed Bivens was a violation of policy. (*Id.* at 58:14–59:2).

Investigator Sparks testified that he investigated the murder of Williams and that he and Shropshire viewed the video captured during the incident shortly after it occurred. (*Id.* at 31:2–13). According to Sparks, he asked for a copy of the video. (*Id.* at 32:17–33:6). Sparks acknowledged that he was aware that video footage needs to be preserved when it is relevant to the investigation of a crime and that his office had a duty to make sure relevant video was preserved for investigation. (*Id.* at 29:11–15, 30:9–14). He also agreed that the absence of the video created problems in the criminal case against Bivens. (*Id.* at 40:22–41:4). Finally, he testified that he was unaware of any written policy regarding how to preserve video footage. (*Id.* at 36:8–25).

With regard to the video, Shropshire testified that the procedure for preserving relevant video evidence was, after Shropshire reviewed the video with Sparks, the video was to be put on a flash drive by Sergeant Rufus Kimble who would burn it onto a disk and place it with the incident report. (*Id.* at 61:16–62:3). Shropshire could not answer whether that had been done in this case. (*Id.* at 62:2–63:24). Moreover, Shropshire could not testify with certainty that the video was attached to the incident report when he sent it up the chain of command. (*Id.* at 64:3–25). Specifically, Shropshire stated "if it would have been with

the incident report I would have watched it again . . . I can't say that I know I watched it again[, b]ut I know I signed the incident report on it." (*Id.* at 65:1–13).

Upon reviewing the video on February 28, 2022, Investigator Sparks created an Investigative Case Summary on March 1, 2022, that detailed what was depicted on the video with time stamps. (*See* Doc. 52-5). According to that report, "[t]he camera timestamp was showing [one] hour ahead of actual time." (*Id.* at 1). At 1314 hours, Defendant was observed walking Williams, who was handcuffed to the rear of his body, back to the cell from the showers. (*Id.*). At 1316:04 hours, Defendant placed Williams into cell J1-37 and "appeared to notice the assault taking place[.]" (*Id.*). At 1316:04 hours, Defendant responded back to cell J1-37 with Sergeant Kimble who "appeared to be speaking into the tray flap and giving commands." (*Id.*). Subsequently, according to the report, medical staff arrived, Williams body was moved from the doorway of the cell and Bivens was escorted from the cell. (*Id.*).

## LEGAL STANDARD

"Courts have the inherent power to police those appearing before them." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). This power "must be exercised with restraint and discretion" allowing the Court to "manage their own affairs" and "fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* (quoting *Chambers*, 501 U.S. at 43–45). The inherent power of sanctioning a party must be based on a party's "bad faith, vexatious[], wanton[], or . . . oppressive" practices. *Id.* (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013)). Thus, "[t]he key to unlocking [a court's] inherent power is a finding of bad faith." *Sciarretta v. Lincoln Nat. Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015) (citation omitted).

Federal Rule of Civil Procedure 37 establishes that:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this

> sanction, the court, on motion and after giving an opportunity to be heard . . . may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Thelisma*, 615 F. App'x 664, 665 (11th Cir. 2015) (per curiam) (quoting *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002)) (considering demeanor of witnesses to determine credibility). Here, "[i]t is the district court's role, as factfinder, to evaluate the credibility of witnesses." *United States v. Montes*, 523 F. App'x 634, 635 (11th Cir. 2013) (per curiam) (citation omitted). This Court has the authority to decide "[t]he good faith, credibility and weight of a defendant's assertions in support of a motion[.]" *United States v. Buckles*, 843 F.2d 469, 472 (11th Cir. 1988) (collecting cases); *see also Thomas v. Sec'y, Fla. Dep't of Corr.*, No. 20-11790, 2022 WL 4350943, at *1 (11th Cir. Sept. 20, 2022) (considering "vague, evasive, and confusing" responses to questions).

## DISCUSSION

Plaintiff asks the Court to sanction Defendant, by striking her Answer, for providing sworn interrogatory responses that she knew were false. (Doc. 18 at 1, 10–17). Plaintiff also asks the Court to sanction GDC, by imposing both monetary and non-monetary sanctions, for failing to preserve and destroying video evidence. (*Id.* at 1, 17–19).

## I.    Defendant Butler's False Statement

Plaintiff moves this Court to sanction Defendant under the Court's inherent authority for, her "perjury[] and for her failure to supplement, amend, or withdraw her perjured responses[.]" (Doc. 18 at 10). Plaintiff argues that the appropriate sanction is that Defendant's Answer should be stricken because "no lesser sanction would sufficiently address the culpability of [Defendant's] conduct or the resulting prejudice to [Plaintiff]." (*Id.* at 13). Plaintiff contends that Defendant knew her interrogatory response was false when she made them based on the two prior witness statements she gave close in time to the event. (*Id.* at 14–16). In response, Defendant argues that Plaintiff's motion does not

7

show that Defendant committed perjury or that sanctions are warranted because she "did not lie or intend to mislead in her interrogatory response" but instead "incorrectly recalled what had occurred[.]" (Doc. 22 at 5). Although Defendant concedes that her interrogatory response contradicted her previous responses, she contends that this was simply based on her misremembering the events or, as she puts it, what she "fixed in her mind[.]" (*Id.* at 6–7).

The Court has reviewed the Defendant's written statements given shortly after the stabbing (Docs. 23-5, 23-6), the Defendant's written response to Interrogatory Number Five (Doc. 18-1), the Defendant's recorded interview with Investigator Travis Sparks on the day of the stabbing (on file with the Court), and Defendant's testimony at the hearing (Doc. 56). When determining the propriety of sanctions, the Court has considered the following factors: the Defendant's interest in resolution of the matter, the Defendant's demeanor, and the consistencies or inconsistencies in the Defendant's testimony. *See Ramirez-Chilel*, 289 F.3d at 750 (affirming consideration of the same). Based on that review, Defendant was clear regarding the details of the stabbing immediately after the incident occurred. Those statements were not vague, elusive, or showing any appearance of faulty memory. In fact, Defendant told the same recitation of the stabbing three times in the immediate aftermath. Even her hearing testimony aligns with her statements given years earlier. But, Defendant's explanation of why she gave the false interrogatory response and her demeanor during the hearing belie her assertion that the false statements were the result of a faulty memory.

Prior to serving the interrogatory, Defendant gave three statements that were consistent with each other. Those statements detailed the incident precisely and showed no signs of inconsistency or a faulty memory. Then, almost two years later Defendant gave an interrogatory response that was inconsistent with the previous statements. While the Court is cognizant of the lapse of time between the statements, Defendant, at the time of the interrogatory, had counsel who could (and should) have advised her to review her previous statements. Moreover, Defendant herself could have reviewed her prior statements to jog her memory. Regardless, at the time of the incident, Defendant consciously acknowledged

8

that her failure to follow safety procedures had created a situation that resulted in a brutal murder. Furthermore, she was reprimanded and told that "[she] created a dangerous situation for [her]self and for [Williams]," "resulting in his death." (Doc. 23-14 at 2). It defies logic that Defendant completely forgot that she did anything wrong. Defendant's demeanor and answers during the hearing convince the Court that Defendant willfully made false statements in her response to Interrogatory Five. Moreover, she continued to be less than truthful during the hearing.

Furthermore, Defendant has yet to amend or correct the interrogatory responses to reflect an accurate rendition of events as required pursuant to Federal Rule of Civil Procedure 26(e). The Eleventh Circuit previously has held that where a party had knowledge of their wrongful conduct but failed to correct such conduct for a period of time, they acted in bad faith. *See J.C. Penney Corp. v. Oxford Mall, LLC*, 100 F.4th 1340, 1346 (11th Cir. 2024). Here, Defendant was on notice, at least by August 15, 2024, that her Interrogatory Response was false and almost seven months passed before she admitted in deposition that those statements were false. That notice, although Defendant presumably knew what her actions were on that day and that her statements were false, came in the form of Plaintiff's response to Defendant's Second Interrogatories. (Doc. 18-6). Therein, Plaintiff expressly called Defendant's attention to her own written and sworn statement that she did not cuff Bivens and only had one set of handcuffs. (*Id.* at 4). Considering the foregoing, the Court finds that Defendant gave a false statement under oath and she did so in bad faith.

Turning now to the appropriate sanction. Plaintiff requests that Defendant's Answer be stricken in its entirety and that default be entered against Defendant. (Doc. 18 at 10, 12–17). The Court, before striking an answer and entering default, must first consider whether lesser sanctions would suffice. *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374–75 (11th Cir. 1999) (per curiam). If a lesser sanction would be ineffective, then the court may impose a default sanction. *See Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1544 (11th Cir. 1993). Because Defendant has since corrected the false response and has done so under

oath, the Court finds that a lesser sanction would suffice to remedy and deter this type of conduct.

When considering the Motion for Summary Judgement, the Court accepts the following facts as true:

1.  Defendant only had one pair of handcuffs when she escorted Williams back to the cell, and Williams was wearing them.

2.  An uncuffed Bivens was seated on the bed when Defendant returned to the cell with Williams.

3.  Defendant placed Williams in the cell with his hands cuffed behind his back.

4.  Bivens attacked Williams while his hands were still cuffed.

In the case of jury trial, the Jury will be given the following instruction:

> During the course of this litigation, Defendant Butler gave a written statement under oath and lied, stating:
>
> With inmate Williams standing cuffed outside the cell, I instructed inmate Bivens to come to the cell door to be cuffed. At that time, inmate Bivens placed his hands through the door flap, and I placed cuffs on inmate Bivens' hands. I then unlocked and opened the cell door and placed inmate Williams in the cell. At that time both inmates were inside the locked cell with their hands cuffed behind their backs. . . . I instructed inmate Williams to come to the door to be uncuffed first. Once inmate Williams was at the door to be uncuffed, inmate Bivens began attacking inmate Williams. I did not know this at the time, but I believe that inmate Bivens somehow slipped out of his handcuffs.
>
> Defendant now admits that statement is false. Moreover, she admits the following facts which you must treat as proven for this case:
> 1.  Defendant only had one pair of handcuffs when she escorted Williams back to the cell, and Williams was wearing them.
> 2.  An uncuffed Bivens was seated on the bed when Defendant returned to the cell with Williams.
> 3.  Defendant placed Williams in the cell with his hands cuffed behind his back.

10

4.      Bivens attacked Williams while his hands were still cuffed.

Furthermore, you may consider the fact that Defendant previously lied under oath about important facts in this case when deciding whether Defendant's testimony during the trial is credible.

## II.      Spoliation of Video

Plaintiff also moves for sanctions against nonparty GDC for the spoliation of video evidence that was reviewed by GDC personnel. (Doc. 18 at 17–19). Specifically, Plaintiff asks the Court to "impose monetary sanctions in an amount sufficient to deter GDC" and "impose the non-monetary sanction of informing the jury that GDC reviewed the video and had a legal obligation to preserve it, but instead destroyed it." (*Id.* at 19). In response, Defendant asserts that because she is not the alleged spoliator and had no duty to preserve the video evidence any spoliation sanction would in turn be against her. (Doc. 22 at 11).

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Alston v. City of Darien*, 750 F. App'x 825, 835 (11th Cir. 2018) (per curiam) (citiation omitted). The moving party has the burden of establishing spoliation. *Temple v. Cox*, No. 2:18-CV-91, 2020 WL 6566177, at *3 (S.D. Ga. Nov. 9, 2020). To establish spoliation, Plaintiff must show that: (1) the "missing evidence existed at one time"; (2) the spoliating party had a duty to preserve the evidence; and (3) the evidence was crucial—not just relevant—to the moving party's ability to prove their case. *Id.* (citation omitted); *see Alston v. City of Darien*, No. CV 216-66, 2017 WL 5560278, at *7 (S.D. Ga. Nov. 17, 2017). Defendant does not appear to dispute the occurrence of spoliation but instead that such a sanction cannot be issued where the spoliator is not a party to the action. (*See* Doc. 22 at 12).

Here, there is no question that the missing video evidence existed at one time because Defendant admits that she reviewed it and a GDC investigative summary indicates that the video was reviewed by others. (Doc. 52-4 at 2; Doc. 52-5). GDC indisputably had

11

a duty to preserve the video evidence and received a preservation request from Plaintiff.[2] (*See* Doc. 18-8). Lastly, the evidence was crucial to Plaintiff's ability to prove her case as it documents the sequence of events and the relative position of the parties. Notably, we cannot know exactly what was captured on the video. For example, the Parties dispute whether some of the stabbing inside the cell would have been captured.[3] (Doc. 56 at 70:8–17; Doc. 22 at 11).

The Eleventh Circuit has affirmed the imposition of sanctions against a non-party by a district court. *See Sciarretta*, 778 F.3d at 1214. In *Sciarretta*, the Eleventh Circuit held that because the non-party was "the driving force behind the litigation" and without their bad faith actions the case would not have had to go to court, the imposition of the sanctions against the non-party was not an abuse of discretion. *Id.* Other courts have made similar conclusions. *See Orlando v. Neal*, No. 5:23-cv-00012, 2023 WL 7413343, at *3 (W.D. Va. Nov. 9, 2023) ("To sanction a nonparty, the court must determine that (1) the nonparty acted in bad faith when engaging in the behavior at issue, (2) the nonparty was subject to the court's inherent power to sanction at the time he did so, and (3) the bad faith conduct disrupted or interfered with the underlying litigation."(internal quotations omitted)); *Ramos v. Swatzell*, No. ED CV 12-1089-BRO (SPx), 2017 WL 2857523, at *7 (C.D. Cal. June 5, 2017) (finding grossly negligent spoliation imputable to defendant to avoid unfair prejudice to plaintiffs based on non-party's duty to preserve); *Woods v. Scissons*, No. CV-17-08038-PCT-GMS, 2019 WL 3816727, at *6 (D. Ariz. Aug. 14, 2019) (imputing spoliation of non-party to defendant where non-party would be responsible for paying any judgment against defendant); *Dykes v. BNSF Ry. Co.*, No. C17-1549-JCC, 2019 WL 1128521, at *6 (W.D. Wash. Mar. 12, 2019) (imputing spoliation of non-party to defendant

---

[2]    Although one was not entered here, because GDC, relying on questionable internal preservation rules, has failed to preserve video in an alarming number of cases brought in this District, the District has begun ordering preservation in cases involving GDC where "cameras recorded the events alleged . . . whether those recordings have been preserved, and the identity of the custodian of the recordings." *See Brooks v. Toby*, No. 5:24-CV-155 (MTT), Doc. 42 (M.D. Ga. July 1, 2025); *Bostick v. Georgia Dep't of Corrs.*, No. 5:24-CV-406 (MTT), Doc. 41 (M.D. Ga. July 1, 2025).

[3]    While Spark's Investigative Case Summary indicates what was captured on the video, as explained below, as a sanction for the spoliation the Court will not consider the summary and neither Sparks nor any other GDC employee will be allowed to testify as to the contents of the video.

where non-party was on notice of pending litigation and were potentially liable for indemnifying the party).

The Eleventh Circuit has distinguished bad faith from negligence based on whether the alleged spoliator purposely lost or destroyed the evidence. *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184–85 (11th Cir. 2020) (collecting cases). Purposely losing evidence includes allowing the evidence to be removed from one's possession while knowing that the evidence needs to be preserved. *See id.* at 1185 (citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 940–42, 944–47 (11th Cir. 2005)). Here, GDC allowed the evidence to be destroyed while knowing that it needed to be preserved. Thus, the Court finds that spoliation sanctions are warranted because GDC destroyed the video evidence in bad faith and has a strong interest in this litigation as potential indemnitor to any judgment Defendant may face.

Appropriate sanctions for spoliation "may include '(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator.'" *Tesoriero*, 965 F.3d at1184 (11th Cir. 2020) (citing *Flury*, 427 F.3d at 945). When constructing an adverse jury instruction, the Court can: (1) deem that certain facts are admitted and must be accepted as true; (2) impose a mandatory, rebuttable presumption; or (3) require the jury to presume that the lost evidence is relevant and favorable to Plaintiff, but also evaluate the spoliating party's rebuttal evidence and then determine whether to draw an adverse inference. *Hyundai Motor Am. Corp. v. N. Am. Auto. Servs., Inc.*, No. 20-82102-Civ-Middlebrooks/Matthewman, 2021 WL 3111191, at *14 (S.D. Fla. July 22, 2021) (citations omitted).

Based on *Sciarretta*, Defendant and GDC will be sanctioned for the spoliation of video evidence as follows: When considering the Motion for Summary Judgment, the Court does not consider Investigator Spark's testimony regarding what he viewed on the recording and the timestamps. In the case of a jury trial the Jury will be instructed that should Defendant be found liable for Williams' death and the attendant damages, as her former employer, GDC will be responsible for paying any such money judgment. The jury will further be instructed that, after being advised of the need to preserve the video which

captured some of the incident, GDC destroyed and/or lost the copy of the video that investigators reviewed and destroyed the video on its systems. Neither Sparks nor any other GDC employee will be allowed to testify about the contents of the video. Furthermore, the jury may infer that the video contained relevant evidence favorable to Plaintiff. Finally, upon resolution of this matter, the Court will determine appropriate monetary sanctions against GDC.

## CONCLUSION

Accordingly, Plaintiff's Motion for Sanctions (Doc. 18) is **GRANTED**.

**SO ORDERED**, this 25th day of March, 2026.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

14