## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

|  |  |  |
|---|---|---|
| HALEY MACKRELL, *as parent of* M.T.M., *surviving child of* HAKEEM WILLIAMS, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 7:24-CV-7 (LAG) |
| | : | |
| ANGELA BUTLER, individually, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## **ORDER**

Before the Court is Defendant's Motion for Summary Judgment (Doc. 23). For the reasons below, Defendant's Motion is **DENIED**.

## **BACKGROUND**

Hakeem Williams was stabbed to death by his cellmate, Jonathan Bivens, at Valdosta State Prison (VSP) after he was placed in the cell handcuffed with an uncuffed Bivens.[1] (*See* Doc. 1). Plaintiff Haley Mackrell brought this 42 U.S.C. § 1983 action on behalf of herself and Williams' daughter, M.T.M., against Defendant Angela Butler, the correctional officer who placed Williams into the cell handcuffed, to recover damages for Williams' death. (*Id.*).

Williams and Bivens were housed at VSP in Building J, a Segregation-Tier II lockdown dorm. (Doc. 23-1 ¶¶ 1–4; Doc. 36-1 ¶¶ 1–4). The Parties refer to VSP as a level five prison, which Defendant explained as meaning that "[i]t's all men, dangerous inmates." (Doc. 23-17 at 34:11–16). According to Georgia Department of Corrections

---

[1]     The relevant facts are derived from the Parties' Statements of Material Facts, responses thereto, and the record in this case. (*See* Docs. 14-4, 15-2, 15-3). When evaluating the Motion for Summary Judgment, the Court construes the facts in the light most favorable to Plaintiff, the nonmoving party. *See* Fed. R. Civ. P. 56; *Jacoby v. Baldwin County*, 835 F.3d 1338, 1342 (11th Cir. 2016) (citations omitted).

(GDC), VSP is a "close security facility which '[h]ouse[s] offenders that other facilities cannot handle due to behavioral issues.'"[2] *Close Security Facilities*, Georgia Department of Corrections, https://gdc.georgia.gov/organization/about-gdc/divisions-and-org-chart/facilities-division/state-prisons (last visited Mar. 9, 2026). "Offenders classified as close security typically fall in one or more categories: escape risk, assault history, deemed dangerous, or have detainers for other serious crimes." *Id.* Moreover, "[o]ffenders with a close security classification . . . [r]equire constant supervision by a Correctional Officer" and are "[h]oused in prisons with high-security levels[.]" *Id.* "The Tier II [lockdown] program [wa]s established to protect staff, offenders, and the public from offenders, who commit or lead others to commit violent, disruptive, predatory, or riotous actions, or who otherwise pose a serious threat to safety and security of the institutional operation[s]." (Doc. 23-9 at 2). For individuals to be placed in the Tier II lockdown program, they must be noted as a threat to safety, have escaped in the past five years, have attempted escape in the past three years, have lead or participated in a major disturbance or riot in the past five years, have failed or refused to participate in Tier I, have participated or lead a major disruptive event, have possessed a firearm or explosive device, have had two or more disciplinary infractions within the past year involving a weapon, or have had three or more disciplinary charges within the past 12 months that involved assault. (Doc. 23-9 at 5).

Defendant was a correctional officer at VSP and was assigned to shifts in the J-Building in February of 2022. (Doc. 23-1 ¶ 7; Doc. 36-1 ¶ 7). According to Defendant, she understood that, given that VSP is a level five prison, the inmates were "dangerous inmates." (Doc. 23-17 at 34:13–16). Moreover, Defendant testified that she knew that the inmates had drugs and weapons and that shakedowns for contraband, which occurred about

---

[2]     Federal Rule of Evidence 201(b) provides for taking judicial notice of facts that are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999). "Under Rule 201 of the Federal Rules of Evidence a court '*may* take judicial notice on its own' or 'must take judicial notice if a party requests it and the court is supplied with the necessary information.'" *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1273 (11th Cir. 2014) (quoting Fed. R. Evid. 201(c) (emphasis added)). "Further, Rule 201 states that a court '*may* take judicial notice at any stage of the proceeding.'" *Id.* (quoting Fed. R. Evid. 201(d)).

2

once every few months, were not carried out often enough to combat the spread of the contraband in the prison. (*Id.* at 33:14–34:14, 126:11–14). She worked on February 4, 5, 6, 9, 10, 18, and 28 on the 6:00 AM to 6:00 PM shift. (Doc. 23-1 ¶¶ 7–8; Doc. 36-1 ¶¶ 7–8). One of her duties was to escort the prisoners from their cells to the showers and back. (Doc. 23-3 ¶ 4). According to GDC policy, when inmates in Tier II leave their cells, they must be handcuffed, and "[a] thorough search of the cell and locking mechanism shall be completed whenever the offender is removed from the cell during showers, medical exams, etc." (Doc. 23-9 at 14, 16). Furthermore, "[a] cell door must not be opened unless two (2) or more Correctional Officers are present at the cell." (*Id.* at 14). GDC Policy also requires that "[b]efore the slot is opened, the staff member shall ensure that the cell light is on. Staff shall order the offender to move to the back of the cell with his hands visible and palms up. Staff shall observe whether the offender has any objects in his or [her] hands." (*Id.* at 15). According to Defendant, she was aware of and trained on GDC policy and knew that a cuffed man must never be placed into a cell with an uncuffed man. (Doc. 23-17 at 50:16–20). Defendant also recognized that locking a cuffed man inside a cell with an uncuffed man could create a dangerous situation for the cuffed man. (Doc. 23-17 at 51:4–10).

Building J has two living units—J-1 and J-2. (Doc. 23-1 ¶ 7; Doc. 36-1 ¶ 7). A week after Bivens was placed in cell J-1-37, Williams was placed in the same cell. (Doc. 23-1 ¶¶ 2–3; Doc. 36-1 ¶¶ 2–3). It does not appear from the record that there were any disputes between Williams and Bivens in the first twenty days that they were cellmates. (*See* Doc. 23-1 ¶¶ 25, 34; Doc. 36-1 ¶ 34 (admitting that there "is no affirmative evidence of a prior violent assault between the[] two individuals[.]")). According to Defendant, she was familiar with Williams and Bivens based on her experience working in the J-Building. (Doc. 23-3 ¶ 6). Defendant testified that she "heard that they both were [B]loods" but did not know the different designations of the Bloods or how GDC classified either inmates' gang affiliation. (Doc. 23-17 at 79:18–80:18).

According to Defendant, when she started her shift at 6:30 AM on February 28, 2022, she had two sets of handcuffs. (Doc. 23-1 ¶ 13; Doc. 36-1 ¶ 13). She began escorting inmates to the shower at 6:40 AM. (Doc. 23-1 ¶ 14; Doc. 36-1 ¶ 14). Defendant escorted

Williams and Bivens to the shower separately. (Doc. 23-1 ¶ 16; Doc. 36-1 ¶ 16; Doc. 23-3 ¶ 12). According to Defendant, she did not have any issues removing either Williams or Bivens from the cell. (Doc. 23-3 ¶ 12). After she escorted Bivens and Williams to the shower, Defendant's supervisor called her to take an inmate from J-1 to the K Building for a medical visit. (Doc. 23-3 ¶ 15). Defendant did not log the inmate medical transfer in the logbook. (*See* Doc. 23-4). Defendant used one of her two sets of handcuffs on the inmate that she took to medical, and she did not remove the cuffs from that inmate. (Doc. 23-3 ¶ 15). Therefore, Defendant only had one set of handcuffs when she returned to the J Building. (*Id.*).

Bivens finished in the shower first, and Defendant placed her remaining set of handcuffs on Bivens before escorting him back to the cell. (Doc. 23-1 ¶ 17; Doc. 36-1 ¶ 17). After putting Bivens in the cell and closing the cell door, Defendant uncuffed him through the tray flap in the door. (Doc. 23-1 ¶17; Doc. 36-1 ¶ 17). When Williams finished showering, Defendant placed him in handcuffs and escorted him back to the cell. (Doc. 23-3 ¶ 17). When asked if she had any issues escorting Williams back to the cell, Defendant testified "[n]o more than usual" and explained, "[y]ou have to always—they always want to run off because it's you and you're smaller than them. And they want to run off. So you have to grab them a little and pull them over. I mean that's with most of the inmates." (Doc. 23-17 at 137:8–10, 12–15). According to Defendant, Williams was pulling away and talking to other inmates about the meal trays as they returned to the cell. (Doc. 23-3 ¶ 18; Doc. 23-17 at 137:2–7). Bivens was on the bed when Defendant and Williams returned to the cell. (*See* Doc. 23-17 at 65:7–10) Defendant did not follow regulations and require the uncuffed Bivens to move to the back of the cell with his hands visible and palms up. (*See* Doc. 23-1 ¶ 22). Nor did she look to see if he had any objects in his hands. (*Id.*). Without handcuffing or requiring Bivens to move to the back of the cell or show his hands; Defendant placed a restrained Williams in the cell with an unrestrained Bivens. (Doc. 23-1 ¶¶ 22–23; Doc. 36-1 ¶¶ 22–23).

As the door to the cell closed, Bivens jumped off his bottom bunk bed, pulled out a nine-inch-long knife, and attacked Williams. (Doc. 23-1 ¶ 22; Doc. 23-5 at 2–3; Doc. 36-

4

1 ¶ 22; Doc. 23-17 at 65:7–10). Defendant testified that when Bivens began attacking Williams, she secured the door, went upstairs to the common area where there was better radio signal, and called a code on the radio for assistance. (Doc. 23-17 at 69:7–12, 135:12–18, 138:5–12; Doc. 23-3 ¶ 21). Defendant initially called a code for medical assistance but quickly remedied the error and called the code for inmate fighting. (Doc. 23-17 at 69:7–12, 135:12–18). Assistance arrived and Bivens was restrained. (Doc. 23-5 at 2). An ambulance was called and Williams was taken to South Georgia Medical Center at 12:45 PM. (*Id.*). He had no pulse and was not conscious while being transported out of the prison. (*Id.*). Williams died from his stab wounds at 12:53 PM. (*Id.*). "A nine inch piece of metal sharpened to a point" was recovered from the cell. (*Id.*).

During the initial post-incident interview conducted on the day of the incident, Defendant gave a statement that she "observed inmate Bivens assaulting Williams with an unknown object." (Doc. 23-5 at 2). Defendant gave another statement about a month after the incident. In that statement, she admitted that she only had one pair of handcuffs when she returned to the J Building after escorting the inmate to medical. (Doc. 23-6 at 2). Furthermore, Defendant stated that she "[r]eturned [i]nmate Williams to [the] cell and didn[']t cuff [] Bivens" who "jumped up off [the] [b]ed and attacked Williams, resulting in his [d]eath." (*Id.*). On March 30, 2022, Defendant was reprimanded for placing the cuffed Williams in the cell with an uncuffed Bivens. (*See* Doc. 23-14). The reprimand concluded that, "[a]s a result of not being cuffed, [Bivens] was able to strike the cuffed [Williams] resulting in his death. You created a dangerous situation for yourself and for [Williams]." (Doc. 23-14 at 2). Defendant was admonished that, "[i]n the future[, she was] not to deviate from the Standard Operating Procedures [(SOP)] on properly securing an inmate."[3] (*Id.*). On June 10, 2022, Defendant received a five percent salary reduction for three months as punishment for her conduct relating to Williams' death. (Doc. 23-15 at 2–3). GDC terminated Defendant's employment on October 25, 2022. (Doc. 23-16).

---

[3] According to a handwritten note along the top of the document, the reprimand was rescinded at some point. (Doc. 23-14 at 2).

On January 22, 2024, Plaintiff filed this action on behalf of her daughter M.T.M., bringing Eighth Amendment deliberate indifference and punitive damages claims under 42 U.S.C. § 1983. (Doc. 1 ¶¶ 38–49). Once litigation began, Defendant changed her story about what happened on the day of Williams' death. During discovery, Plaintiff propounded interrogatories. Interrogatory Number Five asked Defendant to, "state the factual basis for every defense stated in [her] answer to the operative Complaint." (Doc. 18-1). In response, Defendant, under penalty of perjury, stated in pertinent part:

> When inmate Williams finished his shower, I handcuffed him in the same manner and then escorted him back to the cell that he occupied with inmate Bivens in the same manner. Then, with inmate Williams standing cuffed outside of the cell, I instructed inmate Bivens to come to the cell door to be cuffed. At that time, inmate Bivens placed his hands through the door flap, and I placed cuffs on inmate Bivens' hands. I then unlocked and opened the cell door and placed inmate Williams in the cell. At that time both inmates were inside the locked cell with their hands cuffed behind their backs. The normal process at that point is that the inmates must then take turns coming to the door to be uncuffed. I instructed inmate Williams to come to the door to be uncuffed first. Once inmate Williams was at the door to be uncuffed, inmate Bivens began attacking inmate Williams. I did not know this at the time, but I believe that inmate Bivens somehow slipped out of his handcuffs.

(Doc. 18-1 at 4).

During her deposition, Defendant was confronted with her contradictory statements, and she recanted her statement that she had placed Bivens in handcuffs and that he had somehow slipped out of the cuffs. Defendant admitted that the statement she gave in her interrogatory response was not true and that she "thought [she] had did everything that way, but [she] didn't." (Doc. 18-2 at 54:24-55:1). Defendant ultimately admitted that she only had one set of handcuffs when she placed Williams in the cell. (*Id.* at 56:4–9). She also admitted that she put a cuffed Williams into the cell with an uncuffed Bivens and that Bivens did not, in fact, slip out of his handcuffs. (*Id.* at 56:12–17). Defendant was also

6

presented with her March 23, 2022, witness statement and testified that the statement was the truth about what happened. (*Id.* at 60:9–65:24).

Defendant stated during the initial post-incident interview that "video tape was reviewed." (Doc. 23-5 at 3). Defendant GDC failed to preserve and produce the video footage related to William's death despite the fact that, in anticipation of litigation, Plaintiff's Counsel served a preservation letter by fax and email on Warden Shawn Emmons and Timothy C. Ward, Commissioner of GDC. (Doc. 18-8). The preservation letter was dated March 9, 2022, nine days after the killing of Williams. (*Id.*). Therein, Plaintiff demanded that all "documents, tangible things, and electronically stored information potentially relevant to the issues and defenses in this cause" to include "video and animation" be immediately preserved "even if [GDC did] not anticipate producing such [information] or intend[ed] to claim it [was] confidential or privileged from disclosure." (Doc. 18-8 at 2–3). Although video evidence was available to be reviewed by Defendant, Warden Shropshire, and Investigator Sparks, GDC did not abide by this preservation letter. (*See* Doc. 23-5; Investigative Case Summary (on file with the Court)). In an email dated November 21, 2024, from GDC counsel Susan Rutherford, GDC admitted that they do "not have any video footage of the incident in this case" although it "was viewed by the investigator and the deputy warden," "the footage was not downloaded or preserved and as a result, rolled over in the system as most video does." (Doc. 18-9). According to the Investigative Case Summary completed by Investigator Sparks, the video showed Defendant walking a handcuffed Williams back to the cell from showers, placing him into the cell, witnessing the assault take place, and calling for assistance. (Investigative Case Summary (on file with the Court)).

In light of Defendant's false statement in her Interrogatory Responses and Defendant GDC's failure to preserve and produce the video of the incident, Plaintiff filed a Motion for Sanctions against Defendant and non-Party GDC on December 20, 2024. (Doc. 18). The Court held a hearing on February 7, 2025, regarding GDC's objection to the public filing of an audio recorded OPS interview with Defendant; (2) the OPS Summary of the audio interview; and the OPS report reflecting details of video footage that was

7

destroyed in the case in connection with the Motion for Sanctions. (Doc. 21). At the hearing, the Court allowed GDC to file a formal Motion to Seal, and on February 25, 2025, the Parties filed a Consent Motion to Seal, which the Court granted. (Docs. 21, 27, 30). Defendant responded to the Motion for Sanctions on February 10, 2025 (Doc. 22), and Plaintiff replied on February 24, 2025 (Doc. 26).[4] GDC did not respond to the Motion for Sanctions. (*See* Docket). Defendant filed a Motion for Summary Judgment on February 10, 2025. (Doc. 23). Plaintiff responded on April 14, 2025 (Doc. 36), and Defendant replied on April 28, 2025(Doc. 38).

After holding a hearing on the Motion for Sanctions (Doc. 18) on August 21, 2025, the Court granted the Motion. (See Doc. 57). With regard to the Motion for Summary Judgment, the Court imposed the following sanctions:

> When considering the Motion for Summary Judgement, the Court accepts the following facts as true:
> 1.    Defendant only had one pair of handcuffs when she escorted Williams back to the cell, and Williams was wearing them.
> 2.    An uncuffed Bivens was seated on the bed when Defendant returned to the cell with Williams.
> 3.    Defendant placed Williams in the cell with his hands cuffed behind his back.
> 4.    Bivens attacked Williams while his hands were still cuffed.
> . . .
> When considering the Motion for Summary Judgment, the Court does not consider Investigator Spark's testimony regarding what he viewed on the recording and the timestamps.

(*See* Doc. 57 at 10, 13)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is only appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). A genuine issue of material fact exists

---

[4]    On February 27, 2025, Defendant filed a Motion to File Surreply in Opposition to Plaintiff's Motion for Sanctions. (Doc. 29). The Court denies the Motion in a separate Order.

where "there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation omitted). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the nonmoving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). If the movant meets their initial burden, the nonmoving party must demonstrate that there is a genuine dispute for trial. *Gogel*, 967 F.3d at 1134 (citing *Celotex Corp.*, 447 U.S. at 324). The nonmovant must "go beyond the pleadings and . . . present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (citing *Celotex Corp.*, 477 U.S. at 324).

Under Middle District of Georgia Local Rule 56, "[t]he movant for summary judgment . . . shall attach to the motion a separate and concise statement of material facts

9

to which the movant contends there is no genuine dispute to be tried." M.D. Ga. L.R. 56. Local Rule 56 requires the non-movant to respond "to each of the movant's numbered material facts" and warns that "[a]ll material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of the materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." *Id.*; *see Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014). Additionally, Local Rule 56 provides that "documents and other record materials relied upon by a party moving for or opposing a motion for summary judgment . . . be clearly identified for the court" by citations to "dates, specific page numbers, and line numbers" when possible. M.D. Ga. L.R. 56.

Defendant contends that that facts asserted in her statement of material facts should be deemed admitted because "Plaintiff's response to Defendant's statement of material facts (Doc. 36-1) fails to controvert Defendants facts by specific citation to particular parts of materials in the record." (Doc. 38). Upon review of Plaintiff's Response to Defendant's Statement of Material Facts (Doc. 36-1), it appears that out of the 34 paragraphs of material facts submitted by Defendant, Plaintiff's Response to paragraph six is the only response without a citation to the record. (*See* Doc. 36-1 at 2). Plaintiff's responses to the remaining paragraphs include specific citations to particular parts of the record. Accordingly, where appropriate, the Court deems as admitted facts in Defendant's Statement of Material Facts that are supported by specific record citation which were not controverted by Plaintiff in accordance with local Rule 56. *See* M.D. Ga. L.R. 56; *see also Mason*, 24 F. Supp. 3d at 1260; *Reid v. Middle Flint Area Cmty. Serv. Bd.*, No. 1:20-CV-259 (LAG), 2022 WL 4653686, at *2 (M.D. Ga. Sept. 30, 2022).

## DISCUSSION

Defendant seeks summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim under 42 U.S.C. § 1983. (Doc. 23-2 at 7–20). Defendant argues that there is no genuine dispute of material fact regarding Defendant's subjective awareness of a serious substantial risk of harm to Williams, that she acted reasonably in response to the attack, and that she is entitled to qualified immunity. (*See id.*). As discussed below,

construing the facts in the light most favorable to the Plaintiff, there is sufficient evidence in the record for a reasonable jury to determine that Defendant acted with deliberate indifference to Williams' Eighth Amendment right to be free from cruel and unusual punishment. Accordingly, the Court turns to Defendant's claim of qualified immunity.

"Qualified immunity protects government officers acting within their discretionary authority from liability for civil damages unless a plaintiff can show (1) that the officer violated a federal statutory or constitutional right, and (2) that the unlawfulness of the officer's conduct was clearly established at the time." *Wade v. Daniels*, 36 F.4th 1318, 1323 (11th Cir. 2022) (citing *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020)). If issues of material fact exist, courts resolve them "in favor of the plaintiff." *Id.* (quoting *Alston v. Swarbrick*, 954 F.3d 1312, 1317–18 (11th Cir. 2020)).

To receive the benefit of qualified immunity, a government actor must first establish "that [s]he was acting within the scope of h[er] discretionary authority when the allegedly wrongful acts occurred[.]" *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Once it is established that Defendant was acting within the scope of her discretionary authority, the burden shifts to Plaintiff to establish that Defendant is not entitled to qualified immunity. *See Wade*, 36 F.4th at 1323 (citing *Williams*, 965 F.3d at 1156). To prevail, Plaintiff must show (1) that Defendant's conduct violated Williams' constitutional right, and (2) that right was clearly established at the time of the alleged violation. *See Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1319 (11th Cir. 2016) (citation omitted).

I.    **Defendant Was Acting Within Her Discretionary Authority**

Discretionary authority "covers 'all actions of a governmental official that (1) were undertaken pursuant to the performance of [their] duties, and (2) were within the scope of [their] authority." *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)). "[A] government official proves that [she] acted within [her] discretionary authority by showing objective circumstances which would compel the conclusion that [her] actions were undertaken pursuant to the performance of [her] duties and within the scope of [her] authority." *Courson v. McMillian*, 939 F.2d 1479,

11

1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). Plaintiff does not dispute that Defendant was acting within the scope of her discretionary authority. (*See generally* Doc. 36). Defendant was on duty as a correctional officer at VSP conducting inmate management functions on February 28, 2022. (Doc. 23-1 ¶ 7; Doc. 36-1 ¶ 7). Her job as a correctional officer was to supervise inmates and maintain prison security. Although Defendant may have violated GSP policy, the Eleventh Circuit has held that "an officer may act within [their] discretionary function even . . . when [their] conduct possibly violates a department policy." *Gaillard v. Commins*, 562 F. App'x 870, 873 (11th Cir. 2014). Accordingly, Defendant was acting within her discretionary authority, and Plaintiff must show that Defendant's conduct violated Williams clearly established constitutional right.

## II.    Defendant Was Actually, Subjectively Aware that Her Conduct Caused a Substantial Risk of Serious Harm to Mr. Williams

Plaintiff brings an Eighth Amendment deliberate indifference claim against Defendant in her individual capacity. (*See generally* Doc. 1). The Eighth Amendment's proscription against cruel and unusual punishment governs the treatment of convicted prisoners while in prison. *Farmer v. Brennan*, 511 U.S. 825, 832–34 (1994). "[A] prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment if [the official] is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (per curiam) (second alteration in original) (quoting *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016)). "[A] prison official violates the Eighth Amendment only when two requirements are met." *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (quoting *Farmer*, 511 U.S. at 934). First, "the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, 'objectively, "sufficiently serious."'" *Id.* at 1262 (quoting *Farmer*, 511 U.S. at 834). Second, a plaintiff must (1) "prove that the [defendant] was subjectively aware that the inmate was at risk of serious harm"; (2) "must show that the [defendant] disregarded that risk"; and (3) "must demonstrate that the defendant acted with subjective recklessness as used in the criminal law[.]" *Id.* at 1255 (first quoting *Hoffer*

12

*v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020); and then quoting *Farmer*, 511 U.S. at 839) (internal quotation marks omitted).

To demonstrate "subjective recklessness as used in the criminal law," a plaintiff "must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff[.]" *Id.* at 1262 (quoting *Farmer*, 511 U.S. at 839). Subjective awareness requires that a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he also must draw that inference." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 837). Additionally, "even if the defendant 'actually knew of a substantial risk to inmate health or safety,' he 'cannot be found liable under the Cruel and Unusual Punishment Clause' if he 'responded reasonably to the risk.'" *Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 844–45). A plaintiff can overcome this element by showing that the defendant "responded to the known risk in an unreasonable manner, in that he or she 'knew of ways to reduce the harm' but knowingly or recklessly declined to act." *Marbury*, 936 F.3d at 1233 (11th Cir. 2019) (quoting *Rodriguez*, 508 F. 3d at 620).

Finally, Plaintiff must establish the "'necessary causal link' between [the Defendant's] failure to act reasonably and the plaintiff's injury." *Marbury*, 936 F.3d at 1233 (quoting *Rodriguez*, 508 F.3d at 622–23). "This causal element requires proof that the officer '(1) had the means substantially to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded.'" *Nelson v. Thompkins*, 89 F.4th 1289, 1298 (11th Cir. 2024) (quoting *Rodriguez*, 508 F.3d at 622), *cert. denied sub nom. Sellers v. Nelson*, 145 S. Ct. 178, 220 L. Ed. 2d 33 (2024). Prison guards have a duty under the Eighth Amendment to protect inmates from violence at the hands of other inmates. *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam). But "[n]ot 'every injury suffered by one prisoner at the hands of another . . . translates into a constitutional liability for prison officials responsible for the victim's safety.'" *Mosley v. Zachery*, 966 F.3d 1265, 1276 (11th Cir. 2020)

13

(omission in original) (quoting *Bowen*, 826 F.3d at 1320). "An excessive risk of inmate-on-inmate violence creates a substantial risk of serious harm, but occasional, isolated attacks by one prisoner on another may not constitute an Eighth Amendment violation." *Oliver v. Harden*, 587 F. App'x 618, 620 (11th Cir. 2014) (per curiam) (citing *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014)).

As a threshold matter, the deprivation suffered by Williams—the loss of his life—certainly was "objectively, sufficiently serious." *Wade v. McDade*, 106 F. 4th at 1262 (internal quotation marks and citations omitted). The question, therefore, is whether Defendant acted with "subjective recklessness as used in the criminal law[.]" *Id.* To answer that question, the Court must first define the "risk." Here, the risk of which Defendant must have been subjectively aware and recklessly disregarded and to which Defendant must have responded in an unreasonable manner is—considering the known conditions and dangers at VSP and in the J-Dorm at the time of the incident—that attendant to placing a restrained prisoner in a cell with an unrestrained prisoner. We therefore must answer (1) whether Defendant was aware of facts that would allow her to infer that, in February of 2022, a serious risk of harm existed if a restrained prisoner at VSP was locked in a cell with an unrestrained prisoner, and (2) whether Defendant drew that inference. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]" *Farmer*, 511 U.S. at 842. Considering the facts in the light most favorable to Plaintiff, we must answer in the affirmative to both.

Given that the risk of harm of locking a restrained prisoner of a facility designated for dangerous inmates in a cell with an unrestrained prisoner is obvious, we can "infer the existence of [Defendant's] subjective state of mind from the fact that the risk of harm is [so] obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer*, 511 U.S. at 842). Moreover, Defendant testified to her knowledge that VSP was a Level Five Prison and explained that "Level Five" meant that "[i]t's all men, dangerous inmates." (Doc. 23-17 at 34:13–16). She further testified that the J-Dorm was a dedicated lockdown dorm for prisoners who were in segregation. (*Id.* at 34:17–35:7). Under GSP policy, for individuals

14

to be placed in the segregation program they were either a noted threat to safety, a confirmed escape risk, a leader or participant in a major disturbance or riot, an unsuccessful participant in Tier I, found to have possessed a firearm or explosive device, or involved in two or more disciplinary infractions involving a weapon or assault within the past year. (Doc. 23-9 at 5). Furthermore, Defendant had witnessed fights at VSP and in the lockdown dorm. (Doc. 23-17 at 123:19–23). Defendant testified that she couldn't "recall exactly how many times [she heard about fights that occurred when she was off shift], but [that she knew] it was a lot." (*Id.* at 21:10–11). While she could not give an exact number, Defendant was aware of more than ten fights that had taken place at VSP in the year and a half she had been working there. (*Id.* at 12:12–18, 21:2–15). At least one of those fights took place in lockdown, and Defendant had to call for backup. (*Id.* at 20:9–18). Defendant also testified that she knew that there were weapons in the prison and personally had seen prison-made weapons. (*Id.* at 126:11–18) Finally, she acknowledged that "locking one man who is cuffed inside a cell with an uncuffed man could create a dangerous situation for the cuffed man [because] he wouldn't be able to defend himself if he was attacked[,]" and testified that GDC's "policy was to never place an uncuffed man in a cell with a cuffed man[,]" and that she was trained on that policy. (*Id.* at 50:16–20, 51:4–8). It is not necessary for Defendant to have known that Williams "was especially likely to be assaulted by [Bivens,]" the specific prisoner who eventually committed the assault. *See Farmer*, 511 US at 843. Accordingly, there is sufficient circumstantial and direct evidence to allow a trier of fact to find that, considering what Defendant knew about VSP and J-Dorm at the time, Defendant subjectively was aware of facts that would allow her to draw the inference that putting a cuffed Williams in a locked cell with an uncuffed Bivins subjected Williams to a substantial risk of harm and that she drew the inference.

The next question is whether Defendant disregarded the risk engendered by placing the cuffed Williams in the locked cell with the uncuffed Bivins. Clearly, she did. While she lied about doing so in her Interrogatory responses, Defendant admits that she, knowing that it was dangerous and against GDC policy, locked a cuffed Williams in a cell with an uncuffed Bivins. (Doc. 23-17 at 50:16–20, 51:4–8). Finally, Defendant admits that her

15

action was dangerous, violated policy, and led to Williams death. During her deposition, Plaintiff's Counsel read the reprimand that Plaintiff received after the incident. After reading the reprimand, the following exchange occurred:

> Counsel: Do you agree that you created a dangerous situation for yourself and for the inmate?
>
> Defendant: I did. I did.
>
> Counsel:   Do you agree that you deviated from the standard operating procedures on properly securing an inmate, as this document states?
>
> Defendant: I did.
>
> Counsel:  And do you agree that as a result of the dangerous situation that you created by breaking those rules, Hakeem Williams died?
>
> Defendant:  Yes. Yes.

(Doc. 23-17 at 67:4–14).

Defendant argues that "Plaintiff's claim . . . fails because she cannot show that Defendant Butler failed to respond reasonably to the assault. The fact that Defendant Butler did not stop the assault is not proof of deliberate indifference." (Doc. 23-2 at 15 (citations omitted)). This argument and the cases relied upon by Defendant—which generally stand for the proposition that "correctional officers who are present during a violent inmate altercation are not required to intervene immediately when they are unarmed"—miss the point. (*Id.*). This is not a failure to protect or act case. The relevant question is not whether Defendant reacted to the assault in a reasonable manner. Rather, the question here is whether Defendant—who was tasked with returning two prisoners housed in a maximum security prison on Tier II segregation to a single cell—reasonably responded to the risk of harm that arises when one prisoner is cuffed and the other is not. The GDC SOP sets forth a reasonable response to the risk attendant to placing a restrained prisoner in a cell with an unrestrained prisoner. (*See* Doc. 23-9). The section governing the opening of the handcuff

slot provides, in pertinent part, "[b]efore the slot is opened, the staff member shall ensure that the cell light is on. Staff shall order the offender to move to the back of the cell with his hands visible and palms up. Staff shall observe whether the offender has any objects in his or [her] hands." (*Id.*at 15). Here, ordering Bivens, an offender, to move to the back of the cell and to show his hands would have mitigated, to some degree, the risk that he was hiding a shank. Considering these facts, a fact finder reasonably could find that, by failing to follow safety procedures or ask for additional resources, Defendant did not respond reasonably to the risk.

The final question is whether a reasonable trier of fact could find a causal connection between Defendant's failure to act reasonably and Williams' death. There are sufficient facts for the finder of fact to determine that Defendant "had the means to improve Williams' safety"—by following the safety procedures with Bivens. Moreover, as discussed above, Defendant was aware of the danger of putting a cuffed inmate in a cell with an uncuffed inmate. Finally, Defendant had "other means . . . available to [her] which [she] nevertheless disregarded"—ordering Bivens to the back of the cell and requiring him to show his hands or getting assistance or another set of handcuffs. *See LaMarca v. Turner*, 995 F.2d 1526, 1539 (11th Cir. 1993) (finding causal link where "the plaintiffs presented evidence to support their allegations that [the defendant] 'was in a position to take steps that could have averted' the alleged unconstitutional condition . . ., 'but, through [deliberate] indifference, [he] failed to do so.'" (second and third alterations in original)). Accordingly, the record is sufficient to establish that Defendant's deliberate indifference violated Williams' Eighth Amendment Right to be free from cruel and unusual punishment, and the question turns to whether that right was clearly established.

## III.    Williams Eighth Amendment Right was Clearly Established

Defendant is not entitled to qualified immunity because her conduct violated a "clearly established constitutional right[] of which a reasonable official would have known." *Baysa v. Sheriff of Pinellas Cnty. Sheriff's Off.*, No. 21-13943, 2022 WL 2974110, at *1 (11th Cir. July 27, 2022) (per curiam) (citation omitted). The Supreme Court has established that to be "clearly established" "[t]he contours of the right must be sufficiently

clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[A] plaintiff can prove that a particular constitutional right [was] clearly established" by pointing to (1) "binding precedent tied to particularized facts in a materially similar case," (2) "a broader, clearly established principle" that "control[s] the novel facts of [the] particular case," or (3) "conduct which so obviously violates [the] Constitution that prior case law is unnecessary." *Gervin v. Florence*, 667 F. Supp. 1325, 1335 (M.D. Ga. 2023) (quoting *Waldron v. Spicher*, 954 F.3d 1297, 1304–05 (11th Cir. 2020)), *aff'd* 139 F.4th 1236 (11th Cir. 2025).

Defendant contends that "there is no 'clearly established' law requiring unarmed officers to intervene in a violent inmate confrontation." (Doc. 23-2 at 19 (citations omitted)). But as discussed above, this is not a failure to intervene case. The question is whether clearly established law put Defendant on notice that placing a restrained person into a dangerous situation without the ability to defend themselves violates the Eighth Amendment. There does not appear to be any materially similar case from the United States Supreme Court, the Eleventh Circuit, or the Supreme Court of Georgia. We therefore consider whether "a broader, clearly established principle should control the novel facts[,]" or whether Defendant's conduct "so obviously violates [the] [C]onstitution that prior case law is unnecessary." *Corbitt v. Vickers*, 929 F.3d 1304, 1315 (11th Cir. 2019) (first alteration in original) (citation omitted).

Here, Defendant's conduct so obviously violated the Constitution that prior case law is unnecessary. It is well established that, "having stripped [incarcerated persons] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (citations omitted). "[P]rison officials have a duty to afford inmates reasonable protection from a known danger, including violence exacted by other inmates." *Johnson v. Boyd*, No. 7:11-CV-88 (HL), 2019 WL 1277029, at *4 (M.D. Ga. Mar. 20, 2019). As the Eleventh Circuit explained "a prison official violates the Eighth Amendment if he responds to a known risk 'in an objectively unreasonable manner' . . . [*i.e.*,] if 'he knew of ways to reduce the harm but knowingly declined to act' or if 'he knew of ways to

18

reduce the harm but recklessly declined to act[.]'" *Rodriguez*, 508 F.3d at 619–20 (quoting *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1583 (11th Cir. 1995); *see also Hopkins*, 742 F.2d at 1310. That is precisely what occurred here.

Defendant concedes that she knew about the violence and the proliferation of homemade weapons at VSP. (Doc. 23-17 at 31:2–13). Further, Defendant testified that she knew that VSP was a level five prison meaning "[i]t's all men, dangerous inmates" and that the J-dorm "was always a lockdown dorm." (Doc. 23-17 at 34:11–35:11). With this knowledge, Defendant stripped Williams of virtually every means of self-protection when she placed him in a locked cage with his hands restrained with an unrestrained inmate who had not been searched. More to the point, Defendant was aware of the danger of her actions. In her deposition, she testified that "[i]t would be reckless" to place a cuffed man inside a cell with an uncuffed man. (Doc. 23-17 at 51:4–10). She also agreed that such an action could create a dangerous situation for the cuffed man. (*Id.*). By ignoring the safety regulations given her knowledge of the danger, Defendant abjured her "duty to afford [Williams] reasonable protection from a known danger[.]" *Johnson*, 2019 WL 1277029, at *4.

A Defendant's conduct "so obviously violate[s] the Constitution" where such conduct would "inevitably lead every reasonable officer in [the defendant's] position to conclude that the [conduct] was unlawful. *Lee*, 284 F.3d at 1199  (citing *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993))). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). As evidenced by the standing operating procedure and Defendant's own admissions, any reasonable officer in Defendant's position would conclude that placing a handcuffed prisoner—who is housed in a facility for dangerous inmates who additionally have been placed in segregation—in a cell with an inmate who is not handcuffed and has not been checked for weapons is unlawful. Accordingly, Defendant's conduct violated a clearly established constitutional right, and Defendant is not entitled to qualified immunity.

19

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Doc. 23) is **DENIED**.

**SO ORDERED**, this 25th day of March, 2026.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**